In the Matter of the NATURALIZATION OF Joseph ESTEVEZ as a citizen of the United States.

No. 214059.

United States District Court
E. D. Pennsylvania.

Dec. 9, 1960.

Frank J. Eustace, Jr., Philadelphia, Pa., for petitioner.

Eugene E. Cole, Asst. Dist. Director for Citizenship, U. S. Dept. of Justice, Immigration and Naturalization Service, Philadelphia, Pa., Maurice J. Page, Acting Dist. Director.

CLARY, District Judge.

Joseph Estevez, the petitioner herein, was born in Bueu-Hermelo, Pontevedra, Spain, on November 28, 1916; the son of Antonio Estevez and Silveria Gonzalez, residents and nationals of Spain. The father, born on August 11, 1888, emigrated to the United States on September 4, 1920, and in due course filed his Petition No. 94057 for naturalization as a citizen of the United States, which was granted on January 23, 1929, by Order of this Court. Naturalization Certificate No. 2813473 was thereupon issued to him. In 1930 he returned to Spain to bring his family to the United States, but his wife refused to come. However, he did return to the United States in 1932, the date of arrival as evidenced from petitioner's Alien Personal History and Statement, being January 24, 1932. He brought with him on this occasion his sons, Joseph and Manuel. Petitioner, Joseph, has since that date continually resided in the United States. The son, Manuel, died in the United States in 1935. The father returned to Spain in an attempt to again persuade his wife

and remaining son to come to the United States. His mission failed and he decided to and did remain in Spain. The petitioner uncertain of his status, as is evidenced from the record, prior to November 12, 1935, requested a certificate of arrival and paid the fee therefor. Thereafter he received a series of three letters; one from the Commissioner of Immigration in Washington on April 22, 1936 regarding his application for citizenship papers; one on July 7, 1936 from the Philadelphia District Director which stated that as soon as the report of his arrival in this country had been received he would be further notified; and a third letter dated October 15, 1936, again from the District Director in Philadelphia, stating that the Service was making an investigation as to the father's status, after which he would be advised of procedures to take in reference to his citizenship. However, nothing further was ever received from the Service in that regard.

Petitioner, to improve himself, attended the Lincoln Preparatory School for a period of 2½ years and graduated from that school. The Lincoln Preparatory School is a well-known school in this area and presumably gave to the petitioner the equivalent of a high school education. At any rate, the petitioner reads and speaks the English language well, and writes and prints it exceptionally well. In 1938, although he was gainfully employed and certainly at much higher wages that he could hope to receive from the United States Navy, he and an American-born companion appeared at the Navy Recruiting Station, located then at Thirteenth and Market Streets, in the City of Philadelphia, and attempted to enlist in the United States Navy. When he gave his birthplace as Spain, he was told by the Chief Petty Officer in charge, or a least someone in authority, that because of his foreign birth, he was not acceptable as a recruit for the United States Navy. His companion, upon hearing that they could not join together, then withdrew his application and they both left the Recruiting Station together.

Perhaps, as a result of the petitioner's request for a clarification of status or through ordinary investigation, the Service, learning that the father had not returned from his second visit to Spain, on June 5, 1940, filed in this Court a petition for revocation of his naturalization on the ground that he had established a permanent residence in Spain within five years of the date of his naturalization, to wit: April 1, 1933. This Court, on March 19, 1941, after proof of service on the father, through the United States Consul at Vigo, Spain, of the petition for revocation and no appearance or answer having been filed, entered its judgment in Civil Action No. 934 cancelling and declaring null and void Naturalization Certificate No. 2813473. Joseph Estevez, petitioner herein, was not a party to this action, was not served, did not appear, and did not know of the pendency of the action.

Petitioner filed his application for citizenship on the 1st day of May, 1959. He was notified through his attorney under date of September 23, 1959 that the Examiner would recommend that the petition be denied. While an order was entered on November 25, 1959 denying the petition for citizenship, it was later vacated, and the case after several continuances was heard de novo by the Court on August 1, 1960. Because of the complicated facts outlined above with respect to the father's naturalization and denaturalization and the assembling of the data regarding same, the matter was not ready for disposition until within the past several weeks, primarily through a stipulation by the Government and the attorney for the petitioner of the facts outlined above.

The basis of the recommendation of denial of United States citizenship to petitioner was that on Forms DDS 301 and DDS 304 the petitioner under the authority of the Act of Congress approved December 20, 1941 had objected to service in the armed forces of the United States as neutral alien as provided by the provisions of the Selective Training and Service Act of 1940, as

amended by the aforesaid Act of December 20, 1941,[1] each of which forms contained the declaration that in making the said applications to be relieved from such liability, the petitioner understood that by such action he forever debarred himself from becoming a citizen of the United States. From the record of the Selective Service System it appears that petitioner was classified under the Selective Service Act as Class I on December 22, 1942; as Class IV–C on February 3, 1943, and as Class IV–A on September 13, 1945 (the latter two being classifications as an exempt resident neutral alien).

To complete the story of the petitioner's life in the United States—he married an American citizen in 1944, a widow, who then had a son, 14 years of age, and a daughter, 7 years of age, by her first marriage. A daughter was born of this marriage in 1947, so that at the time of the hearing petitioner had a stepson, age 30 years, who had served in the Armed Forces; a stepdaughter, age 23 years, and a daughter, age 13 years. Petitioner, as testified to by his wife, has been a good husband, supported his stepchildren during minority, is still supporting his wife and daughter, and is in all respects a good moral person and a good living resident of the United States.

The first question here involved is whether petitioner was already a citizen of the United States at the time he signed Forms DDS 301 and DDS 304. If in fact he already was a citizen of the United States, then it is not now necessary to entertain this petition.

There is no dispute that when petitioner, while still a minor, entered this country in 1932 he automatically derived United States citizenship by virtue of his father's certificate of naturalization. Unless he thereafter lost his derivative citizenship, he would now be a citizen of the United States.

The relevant section of the Nationality Act of 1940, 8 U.S.C.A. § 738(d), effective January 13, 1941,[2] provides:

"(d) The revocation and setting aside of the order admitting any person to citizenship and canceling his certificate of naturalization under the provisions of subsection (a) of section 738 shall not, where such action takes place after the effective date of this chapter, result in the loss of citizenship or any right or privilege of citizenship which would have been derived by or available to a wife or minor child of the naturalized person had such naturalization not been revoked, but the citizenship and any such right or privilege of such wife or minor child shall be deemed valid to the extent that it shall not be affected by such revocation: Provided, That this subsection shall not apply in any case where the revocation and setting aside of this order was the result of actual fraud."

■ The Government does not contend that petitioner's father obtained his citizenship by actual fraud. In view of the provision in the statute referred to above, therefore, it would seem that petitioner was already a citizen of the United States since his father's certificate was not revoked until after the effective date of the Act. However, a reading of the Saving Clause of this statute leads us to an opposite conclusion. Section 747 (a)[3] provides in part:

"(a) Nothing contained in either subchapter III (Sections 701–747) * * * of this chapter, unless otherwise provided therein, shall be construed to affect the validity of any * * * proceeding which shall be valid at the time this chapter shall take effect; or to affect any prosecution, suit, action, or proceedings, civil or criminal, brought, or any act, thing, or matter, civil or

---

1. Now 50 U.S.C.A.Appendix, § 453 et seq.

2. Now 8 U.S.C.A. § 1451(e).

3. Now 8 U.S.C.A. § 1101 note.

criminal, done or exising, at the time this chapter shall take effect; * * "

Since the proceedings to revoke petitioner's father's certificate were instituted prior to the effective date of the Act, it cannot be said that he retained his derivative citizenship despite the subsequent revocation of that of his father. The Courts in construing the saving clause of this Act have repeatedly held that the clear words of the statute indicate that the purpose of the clause was not to disturb or affect naturalization matters or proceedings or acts or things awaiting disposition or decision at the time of the effective date of the statute. Petition of Otness, D.C.1943, 49 F.Supp. 220; In re Shaver, 7 Cir., 1944, 140 F. 2d 180; Bertoldi v. McGrath, 1949, 86 U.S.App.D.C. 1, 178 F.2d 977.

Petitioner, citing Cepo v. Brownell, D.C.1956, 147 F.Supp. 517, submits that Section 738(d) of the Nationality Act of 1940 was intended merely as a clarification of the then existing law. However, the greater weight of authority in determining what the law was before this Act have held that derivative citizenship was lost if the person through whom the party derived his citizenship had the certificate revoked for either actual or presumptive fraud. Battaglino v. Marshall, 2 Cir., 1949, 172 F.2d 979; Manha v. Brownell, D.C.1956, 146 F. Supp. 411; Antonacci v. Brownell, D.C. 1955, 133 F.Supp. 201; Luria v. United States, 1913, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101. Moreover, the very wording of the Act clearly indicates that the law was different before the passage of this Act. Since petitioner's father failed to return to the United States, it is presumed that he obtained his certificate by fraud. Therefore, petitioner cannot be said to have retained his derivative citizenship by virtue of the old law.

Petitioner also contends that the order revoking his father's certificate of naturalization did not affect him since he was not made a party of record in the proceedings against his father. The cases, however, hold that this is not required. Rosenberg v. United States, 3

Cir., 1932, 60 F.2d 475; United States ex rel. Harrington v. Schlotfeldt, 7 Cir., 1943, 136 F.2d 935.

The case is further complicated by the fact that there was in existence at the time of all of the events related above, a Treaty between the United States and Spain, signed at Madrid, July 3, 1902; ratified by the United States, February 6, 1903, and by Spain, March 30, 1903, 33 Stat. 2105. Article V thereof provided in part as follows:

"The citizens or subjects of each of the High Contracting Parties shall be exempt in the territories of the other from all compulsory military service, by land or sea, and from all pecuniary contributions in lieu of such, as well as from all obligatory official functions whatsoever."

The record is devoid of any testimony as to whether the petitioner here knew of the existence of such a Treaty. Under the authority of the case of Moser v. United States, 1951, 341 U.S. 41, 47, 71 S.Ct. 553, 95 L.Ed. 729, had the petitioner herein timely claimed an exemption on the basis of the Treaty, he undoubtedly would have been permitted to sign a Revised Form 301 which would not have debarred him from citizenship. However, that was not done in this case and he thereby lost the benefit of the Treaty provisions. Mr. Justice Minton at page 46 of the opinion, 71 S.Ct. at page 555 concisely states the effect of a Treaty provision in the following language:

"The qualifications for and limitations on the acquisition of United States citizenship are a political matter which the Treaty did not presume to cover.

"Thus, as a matter of law, the statute imposed a valid condition on the claim of a neutral alien for exemption; petitioner had a choice of exemption and no citizenship, or no exemption and citizenship."

The Government in its brief correctly states the sole and final question remaining: "The question here involved

is whether this petitioner had the opportunity to knowingly make an intelligent choice in applying for exemption from military service." This is a question of fact which the Court must determine. The petitioner stated in his testimony unequivocally that when he signed Forms DDS 301 and DDS 304 he did not read the forms carefully; that they were never explained to him; and that he did not understand that he could never petition for American citizenship. He further stated that had he known the legal effect of these documents, he would never have claimed the exemption.

The Court is of the opinion that the petitioner now honestly believes the above testimony to be true. However, I cannot accept it as a fact. Petitioner had the equivalent of a high school education. He speaks the English language well and writes it well. The very nature of the forms required that they be read in order to give an intelligent answer to the questions asked. There is no dispute that the petitioner completed these forms himself and it follows that he must have read them.

Petitioner's counsel has argued, and ably argued, that there are present here sufficient confusing and misleading circumstances in connection with this man's citizenship as to negate the fact that he made an "intelligent choice". He also argues, and in this I agree completely with him, that the petitioner (absent the signing of the forms) is good citizenship material. He has never left this country; he married an American citizen; he supplied a soldier son for service in the Armed Forces; he supported and educated three children, and has held down two jobs to provide better living conditions for his family. All of this is, of course, to his great credit. However, as pointed out in the Government's brief, the highest courts in this land have often remarked that the petitioner has the burden of establishing his qualifications for citizenship and that any doubt must be resolved in favor of the United States and against the petitioner, citing United States v. Macintosh, 1931, 283 U.S. 605,

51 S.Ct. 570, 75 L.Ed. 1302; United States v. Schwimmer, 1929, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889; United States v. Manzi, 1928, 276 U.S. 463, 48 S.Ct. 328, 72 L.Ed. 654, and Brukiewicz v. Savoretti, 5 Cir., 1954, 211 F.2d 541.

The Government concedes that a decision against the petitioner will be harsh. It will be. But I must find, albeit reluctantly, that petitioner has failed to present a case which entitles him to citizenship. The petition, therefore, must be denied.